# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

KEVIN McMURPHY,

    *Plaintiff*,

v.                                          CASE NO. 13-CV-10600

COMMISSIONER OF                 DISTRICT JUDGE GERALD E. ROSEN
SOCIAL SECURITY,                MAGISTRATE JUDGE CHARLES E. BINDER

    *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims a period of disability, Disability Insurance

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Benefits ("DIB"), and Supplemental Security Income ("SSI") benefits. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 11.)

Plaintiff Kevin McMurphy was 44 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 6 at 34.) Plaintiff's employment history includes work as a corrections officer. (Tr. at 192.) Plaintiff filed the instant claims on August 12, 2010, alleging that he became unable to work on October 1, 2009. (Tr. at 165, 168.) The claims were denied at the initial administrative stage. (Tr. at 95.) In denying Plaintiff's claims, the Commissioner considered osteoarthritis and allied disorders and affective disorders as possible bases for disability. (*Id.*) On September 21, 2011, Plaintiff appeared before Administrative Law Judge ("ALJ") Jessica Inouye, who considered the application for benefits *de novo*. (Tr. at 10-28, 29-80.) In a decision dated October 13, 2011, the ALJ found that Plaintiff was not disabled. (Tr. at 25.) Plaintiff requested a review of this decision on November 3, 2011. (Tr. at 7-9.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), when, on January 8, 2013, after review of additional exhibits[2] (Tr. at 256-62, 508-43), the Appeals Council denied Plaintiff's request for review. (Tr. at 1-6.) On February 12, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

**B.      Standard of Review**

---

[2]In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d

at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability"). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record,

4

regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

## C.    Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381 *et seq*. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

   **D.    ALJ Findings**

6

2:13-cv-10600-GER-CEB   Doc # 13   Filed 12/17/13   Pg 7 of 28   Pg ID 632

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through December 31, 2014, and had not engaged in substantial gainful activity since October 1, 2009, the alleged onset date. (Tr. at 16.) At step two, the ALJ found that Plaintiff's degenerative disc disease, diabetes mellitus, neuropathy, hypothyroidism, obesity, bipolar disorder, personality disorder, and alcohol abuse were "severe" within the meaning of the second sequential step. (*Id*.) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 16-17.) At step four, the ALJ found that Plaintiff could not perform any past relevant work. (Tr. at 22.) The ALJ also found that Plaintiff was 42 years old on the alleged disability onset date and thus met the classification of a "younger" individual, which is defined as ages 18 through 49. (Tr. at 23.) At step five, the ALJ found that Plaintiff could perform a limited range of light work. (Tr. at 17-23.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 24-25.)

### E.    Administrative Record

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff was treated at Michigan Spine and Pain for low back pain from October 2009 through March 2011, primarily with Marvin Bleiberg, M.D. (Tr. at 263-86, 462-87.) An MRI of Plaintiff's cervical spine taken on October 15, 2009, showed "[n]o evidence of central canal stenosis[,]" "[r]ight paracentral disc protrusion at C6-C7 with uncinate hypertrophy causing narrowing of the right existing foramina" and "[n]o evidence of central or spinal stenosis." (Tr. at 286, 380.) Plaintiff was treated with lumbar epidural steroid injections in September and November of 2010. (Tr. at 467-83.) Plaintiff reported that the injections were helpful and that "by the next day he was feeling pretty good and could tell that he was moving more easily with less pain." (Tr. at 472.)

7

On October 27, 2009, Timothy Uhlmann, Ph.D., noted that Plaintiff "gets 'bombarded' by concerns [and] worries obsessively," but is "still coaching basketball. Good with the kids." (Tr. at 313.)

An MRI of Plaintiff's lumbar spine taken on January 13, 2010, showed

1.  At L2-L3, there is slight bulging of the annulus fibrosus eccentrically to the left without central canal stenosis or neuroforaminal encroachment.

2.  At L4-L5, there is small to moderate sized broad based central disc protrusion which impresses upon the thecal sac anteriorly resulting in mild narrowing of both lateral spinal recesses. Overall, there is not significant central canal stenosis or neuroforaminal encroachment at this level.

3.  There are mild to moderate lower lumbar facet degenerative changes bilaterally.

(Tr. at 284-85, 371, 377.) An EMG conducted on Plaintiff's cervical spine on May 6, 2010, was normal. (Tr. at 279.) An EMG of Plaintiff's lumbar spine conducted on May 5, 2010, was "consistent with left Peroneal motor axonal neuropathy," but there was "no electrodiagnostic evidence for a Lumbar Radiculopathy." (Tr. at 282.)

A thoracic MRI taken on January 13, 2010, showed "[m]ulti-level disc degeneration and end plate irregularities compatible with Schmorl's node[,]" "[n]o significant focal disc herniation or spinal stenosis[,]" and "[c]alcification of the ligamenium flava posteriority at roughly the T5-T6 level minimally impacting the dorsal thecal sac but otherwise normal." (Tr. at 282, 372, 378.)

Plaintiff was also treated at Thunder Bay Community Health Services from October 27, 2009, through September 1, 2010. (Tr. at 287-349.) Plaintiff participated in behavioral health sessions at the Onaway Clinic of Thunder Bay Community Health Services from September 2009 through August 2010. (Tr. at 350-64.) On March 23, 2010, Dr. Uhlmann noted that Plaintiff was "on administrative leave while [being] investigate[d]" and that Plaintiff "got a ticket for going 56 mph in a 40 mph zone, [that he] got very angry and [had] no way to channel it." (Tr. at 357.) On

March 23, 2010, it was also noted that Plaintiff "lives to fish and hunt." (Tr. at 358.) On April 27, 2010, Dr. Uhlmann noted that Plaintiff "[g]oes to the casino and loses more than he can afford" but "[d]oesn't go often." (Tr. at 356.) Dr. Uhlmann also noted that Plaintiff "is very competitive" and "[g]ets so mad if he loses nobody wants to play with him" and that he "[k]now[s] it's stupid, childish, but can't believe/accept that someone else drew the card [Plaintiff] needed. So why does the universe single the [Plaintiff] out for such abuse." (*Id.*) On August 24, 2010, Dr. Uhlmann noted that Plaintiff "is a trophy hunter" who is "[b]ored with hunting around here" and "[w]ants to hunt monster deer in Pike County, Il." (Tr. at 352.) Dr. Uhlmann also noted that Plaintiff is "impulsive and has grandiosity" and "[l]ost $12,000 playing black jack all night at the casino." (*Id.*)

Plaintiff was treated by Sunil Rangwani, M.D., from June to August of 2010. (Tr. at 365-69.) Plaintiff was referred t Dr. Ragnwani by Dr. Uhlmann due to mental health issues. On June 14, 2010, Dr. Rangwani diagnosed bipolar disorder (type II), gambling addiction (currently in remission), and wanted to "[r]ule out alcohol abuse." (Tr. at 369.)

Plaintiff underwent a neurological consultation with Paul Davis, M.D., and had spinal x-rays taken on November 18, 2009, and January 13, 2010. (Tr. at 373-79.) Dr. Davis concluded that "I really do not feel that clinically he is suffering from radicular pain, myelopathy, or any nerve compressive syndrome." (Tr. at 375.)

An assessment with recommendations was performed by Marvin Bleiberg, M.D., on February 12, 2010. (Tr. at 398-99.) Dr. Bleiberg opined that Plaintiff "is not capable of any work at this time to include the light duty job description you asked me to review." (Tr. at 398.) Dr. Bleiberg referred to psychiatric testing results and concluded that "[i]ndividuals with his findings are usually viewed as having a sever [sic] personality disorder with the possibility of delusional

disorder which I don't think should be placed in the type of work environment in question whether high physical demand or sedentary. He does not appear to be mentally safe." (Tr. at 398.) Dr. Bleiberg then noted, however, that "further comment on his emotional psyche would need to come directly from psychiatry as it is out of my scope of practice." (*Id.*)

As to actual physical limitations, Dr. Beliberg indicated that Plaintiff "should in no way be placed in an environment where he may come in contact with any prisoners, be in danger of any confrontation, have any physical demands, have to stand or sit for any duration – must be able to adjust frequent[ly] on his own accord, avoid all repetitive activities to upper and lower limbs, be exposed to extreme temperatures, perform body exams or inspection, or be in charge of weapons at this time." (*Id.*) Dr. Bleiberg concluded that "[a]lthough I feel some improvement will occur with outlined treatment plan and his function can be improved/pain managed – I am not of the opinion at this time that correctional officer would be a place of employment he will or should be attempting to return to." (Tr. at 399.)

An independent medical exam was performed on June 25, 2010, by R. Scott Lazzara, M.D. (Tr. at 401-08.) As to neck and back pain, Dr. Lazzara found that Plaintiff "did have a significant myofascial component" but there "were no myelopathy or neuropathy noted . . . [and] he is scheduled to undergo physical therapy. He may require operative intervention at some point but it does not appear impending." (Tr. at 405.) As to diabetes, Dr. Lazzara noted that Plaintiff "does not check his sugars. I do not find any evidence of sequela today. However he does complain of neuropathy. At this point, sugar control would be optimal." (*Id.*) Plaintiff's strength was 5/5. (Tr. at 408.)

An independent psychiatric exam was performed on July 23, 2010, by Mukesh Lathia, M.D. (Tr. at 409-12.) Dr. Lathia diagnosed bipolar disorder, depressed; cocaine and marijuana abuse,

in full remission; alcohol abuse, in questionable remission; and personality disorder, NOS. (Tr. at 412.) Dr. Lathia opined that Plaintiff "is at this point ill-suited psychiatrically to carry out his job as a corrections officer and he is not capable to respond appropriately to supervision and co-workers and work pressures in a work setting . . . . Again, the patient is currently ill-suited psychiatrically to carry out job requirements of a corrections officer." (*Id.*)

An Independent Medical Advisor ("IMA") statement of mental disability form was completed by Laurence Domino, M.D., a non-examining physician. (Tr. at 413-17.) Dr. Domino reviewed Plaintiff's medical records and concluded that "the medical evidence points to a very disturbed individual with several mental health issues that are very difficult to treat. It is felt his condition will not improve. Mr. McMurphy is unable to perform at any occupation successfully." (Tr. at 417.)

Plaintiff participated in physical therapy with the Alpena Regional Medical Center Rehabilitation Services from September to October 2010. (Tr. at 418-22.) Upon discharge, it was noted that Plaintiff's pain improved from severe to moderate, flexibility was improved by 25%, strength and endurance were improved to maximal level, and pain was decreased by 25%. (Tr. at 419.) It was also noted that Plaintiff's "[m]ain impairment for pain seems to be anxiety, fear, and stress. All of these combine to make Kevin fearful of motion. So even on his 'good' days, he worries it will get bad. Client is being followed by MD who is aware. We spoke of the importance of activity and pain control and also encouraged Kevin to keep working with his MD on the anxiety." (Tr. at 420.)

Another independent psychiatric examination was performed on November 19, 2010, by Elliot Wolf, M.D. (Tr. at 423-33.) Dr. Wolf reviewed Plaintiff's medical file and noted that "[i]t was Dr. Stehouwer's opinion that Mr. McMurphy was capable of working and he was, therefore,

called back to work in February, but only briefly so. . . . Mr. McMurphy acknowledged that he left a voicemail message to Dr. Stehouwer threatening to harm him, as a result of which Mr. McMurphy was terminated." (Tr. at 425.) Dr. Wolf stated that Plaintiff "presented today in a highly emotional fashion . . . [h]owever, as the discussion proceeded he relaxed noticeably, maintained better eye contact, became more spontaneous, and was fully cooperative." (*Id.*) Plaintiff reported that "his personality is such that it is not a good fit for him to work in a company or a system because, for one thing, he tends to rebel against authority" and he reported having "been in a lot of verbal, as well as physical altercations, most recently he got involved in a bar fight last January prompted by jealousy." (Tr. at 425-26.) Plaintiff also "described himself as a perfectionist. He stated that he has been fired from every job he has ever had." (Tr. at 426.)

"When asked to describe his daily activities, Mr. McMurphy stated that after breakfast he may visit his mother[,] [] may shop for groceries or run other errands[,] [] watches television including sports[,] [] may drink half a pint of vodka once or twice a week, but he denied the use of other recreational drugs." (Tr. at 427.)  Dr. Wolf noted that Plaintiff's "intellectual ability appeared to be in the high-average range[,] [t]here was no evidence of cognitive impairment of an organic type[,] [h]e is clearly depressed, but there is no psychomotor slowing...[t]here is no constriction, blunting or flattening of affect[,] no clear evidence of a thought disorder of a psychotic type[,] []no history or evidence of hallucinations[.]" (Tr. at 430.)  Dr. Wolf concluded, "[w]hile it is my opinion that he is currently unable to work, I am also of the opinion he might be capable of employment in the future if he had access to proper psychiatric treatment...The nature of the therapy with Dr. Uhlman[n] is difficult to discern.  In my opinion, with proper treatment, Mr. McMurphy's prognosis to feel and function better and more stable, would be more favorable." (Tr. at 431.)

A Medical Source Statement was completed by Timothy Uhlmann, Ph.D., on April 6, 2010. (Tr. at 434-43.)  Dr. Uhlmann indicated that he sees Plaintiff "[m]onthly or every 2 months individual therapy" and performs medications reviews "monthly or even 1 ½ months[.]" (Tr. at 435.)  Dr. Uhlmann found Plaintiff was moderately to markedly limited in every functional area. (Tr. at 436.) In an attending physician statement completed on January 26, 2010, Dr. Uhlmann indicated that Plaintiff was unable to perform the duties of his occupation as a corrections officer but also indicated that Plaintiff was able to perform the essential duties of other occupations and that Plaintiff could return to work on June 1, 2010, without any restrictions. (Tr. at 441.) There were no impairments in cognitive functioning, no delusional ideations, and no hallucinations noted. (Tr. at 442.)

A Psychiatric Residual Functional Capacity ("RFC") Assessment was completed by Dr. Uhlmann on June 22, 2011. (Tr. at 444-47.) In this assessment, Dr. Uhlmann concluded that Plaintiff is "unable to return to work, unless symptoms controlled by medication." (Tr. at 446.) Again, Dr. Uhlmann found Plaintiff was moderately to markedly limited in all areas of functioning. (Tr. at 447.)

A Mental RFC Assessment was completed on July 8, 2011, by Dr. Uhlmann. (Tr. at 448-61.) In this assessment, Dr. Uhlmann concluded that Plaintiff was limited but satisfactorily able to remember work-like procedures, unlimited in his ability to understand, remember and carry out short and simple instructions, ask simple questions or request assistance, and to be aware of normal hazards and take appropriate precautions, and was limited but satisfactorily able to maintain attention for a two-hour segment, make simple work decisions, adhere to standards of cleanliness and neatness, travel in unfamiliar places, and use public transportation. (Tr. at 450.) Dr. Uhlmann also found that Plaintiff was seriously limited but not precluded in his ability to maintain regular

attendance and be punctual, perform at a consistent pace without an unreasonable number and length of rest periods, respond appropriately to changes in a routine work setting, understand, remember, and carry out detailed instructions, set realistic goals or make plans independently of others, and deal with stress of semiskilled and skilled work. (*Id.*) Dr. Uhlmann found that Plaintiff was unable to meet competitive standards or had no ability to function usefully in the remaining categories. (*Id.*) Dr. Uhlmann opined that Plaintiff's impairments would cause him to be absent from work more than four days per month. (Tr. at 451.)

On September 15, 2011, Dr. Uhlmann completed a long-term disability functional capacity for psychiatric impairment form wherein he opined that Plaintiff is unable to return to any reasonable occupation because Plaintiff "is rigid and cannot accommodate and when he acts out could be a danger to others in the work place." (Tr. at 490.) Dr. Uhlmann indicated that Plaintiff is not significantly limited in his ability to perform repetitive or short cycle work or in his ability to perform work alone or in physical isolation from others but is moderately or markedly limited in all other areas of functioning. (Tr. at 491.)

Plaintiff was also treated by Carolyn Koppenol, M.D., in September 2011. (Tr. at 492-507.)

At the administrative hearing, Plaintiff testified that he lives with his girlfriend and four children in a multi-level home. (Tr. at 35.) Plaintiff testified that he was able to purchase the home because it was in foreclosure and in very poor condition. (Tr. at 36.) Plaintiff further stated that his father is good at building and is improving the house while Plaintiff stated that he has not done "much except for clean. I don't have much skills in regards to the building . . . I'm pretty much [my dad's] gofer." (*Id.*) Plaintiff testified that, since October 1, 2009, he "only worked, actually, went back to work for a day-and-a-half at the prison, Pugsley Prison." (Tr. at 38.) Plaintiff explained:

. . . I also get a medical retirement from the state. Because I had - - I had about 20 years in, and then I - - you know, when my doctors put me off, I filed for retirement and that was quite a while coming, but finally I got it so - -

. . . .

Well, what happened, my back doctors put me off and they sent me to a - - like a spine, pain specialist, and they gave me a note that said I was totally disabled and whatever, and then in the meantime, I have a lot of problems with anxiety as my main problem, and so I was seeing my psychologist at the same time, and, basically, when I went back in to see him, he told me - - said, "That's it, I'm not letting you go back to work." And so he started making that paperwork happen.

And, so when that happened, they sent me to - - long-term disability sent me to IMEs, and the one IME seen me for the mental condition, you know, I kind of beared [sic] my soul to this man, and when I told him some things about my dad, he put it in the notes that I was lying. That I made this stuff up. And I know that he knew that I wasn't. And I was so angry about that, because I was, you know, basically being asked to go back to work at Pugsley Prison and between my back problem and the anxiety problem that I've always had, I just knew that I couldn't do it.

(Tr. at 38-39.) Plaintiff added:

What had happened is I, actually, reported back to work that they forced - - you know, said, "No, this guy's fine, go back to work." And it was the same day that I got the report from State, however, that said that, you know, I was faking basically. And I was so - - in which I get - - I get really, really angry. I get frustrated to the point where I get so angry and I called down there, and I called and called and called, and I couldn't get him to talk to me, and I was trying to get a copy of the MMPI that I had done down there.

And, so, finally, because I couldn't get a hold of him, I left a message on his voice mail that, you know, was pretty nasty and, you know, basically, threatened, I guess, they said. And, so, the second day that I was, actually, at the prison, they forwarded that message to the prison and they put me on, what they call, stop order, which - - and these people didn't know me. I had never worked there before . . . I worked at Camp Lamont [PHONETIC], but they put me on stop order, and I was off for four months on administrative leave and subsequently fired for that threat.

(Tr. at 40-41.) When asked whether he filed a grievance after his termination, Plaintiff responded, "Yes. And that was all turned around completely. I'm, you know, considered retired in good faith[.]" (Tr. at 41.)

Plaintiff further testified that he has always "had problems getting along with people" and that his former boss told him he could have fired him "once a week" for his "anger outbursts, you

know, and slamming a door or just getting mad at somebody or whatever, yelling, whatever." (Tr. at 42.) He further stated, "I think people have generally always kind of liked me even though they think I'm kind of goofy." (*Id*.) Plaintiff indicated that he was fired several times before because of anger issues, such as kicking a trash can at his boss when he was an eighteen year-old. (Tr. at 43.)

Plaintiff indicated that general background noise does not bother him nor does it interfere with his focus, but that when he is concentrating and is interrupted by noise, that irritates him. (Tr. at 46-47.) Plaintiff stated that his problem with people is "[b]eing around people to interact that I might disagree with or that I find - - I don't know, that I really don't want to talk with, I guess[.]" (Tr. at 48.) Plaintiff elaborated that "if I had 100 supervisors in my career, I had significant problems with 98 of them. You know, and once I hit that point to, you know, I don't like you, you don't like me, it was just a battle, I mean, it was just a daily - - and those, you know, and/or people who I considered to be fake or whatever, you know, I wouldn't want to be around people like that." (Tr. at 48-49.) Plaintiff further testified, "it was just literally crippling at times, but not all the time." (Tr. at 49.)

Although Plaintiff "figured that the anxiety and all these problems, all these years, I just blamed it on corrections," but when he "was off work, I was really struggling, because it, actually, got worse[.]" (*Id.*) However, Plaintiff added that "since I haven't worked for a long period of time, I will say that it has been better[.]" (Tr. at 50.) Plaintiff stated, "I don't know if I'm depressed because of anxiety or if I'm anxious because of depression," and that his "whole life I've been in fights with people and completely misunderstood, it seems like." (Tr. at 51.) When asked to describe his symptoms, Plaintiff stated, "It's a physical feeling" almost like he "got into a car accident. . . . After the adrenaline, and when that goes away, that total feeling of just like a buzz

in your body" and that this feeling lasts "five weeks the last time I went through that." (Tr. at 51-52.)

As to back pain, Plaintiff described it as "a constant feeling of - - I guess if you've ever woken up with a stiff neck. I have that constantly. . . . My lower back, if I lift anything at all, I've got a muscle right down here that will take and throw me out, whatever - - to the point where my body is, literally, like this [crooked]; and it will stay like that for a day, maybe three days, maybe five days." (Tr. at 54.) As to the amount of weight that triggers such a reaction, Plaintiff indicated "[t]he last time that it went out really bad was a basket full of wet laundry that I picked up and carried out of the car . . . ." (Tr. at 55.) Plaintiff added, "I have a lot of back pain, it just never goes away." (*Id.*) When asked to describe the pain, Plaintiff responded, "It's more - - you know, when you say pain, it's more - - if I could  - - if I could sell uncomfortableness to you. . . It's very uncomfortable. Like I just can't get comfortable." (*Id.*) Plaintiff stated that he had "quite a bit of success" with "steroid injections into my spine six or eight months ago" and that his "lower back has only been out twice, really extremely bad since th[ose] shots." (Tr. at 57.)

Plaintiff also stated that his "hands and feet are numb a lot . . . [from] any type of sleep on my arm or anything. I mean, my hands are numb for the first 15 minutes, but it's pretty much all day. My thumbs are both numb all the time. My big toes." (Tr. at 56.) Plaintiff also stated that his "hands and feet will ache so bad that it's pretty bad when they start to get aching like that." (Tr. at 56-57.)

When asked how long he could sit before needing to stand up and stretch, Plaintiff responded, "that's a tough question for me, because I like to be honest. And I could sit here for a long time, but it would be the getting up part, that would be the hard part for me, I mean, and the stiffen-up part, you know, like we sit here even now, my back is quite a bit stiffer than when I

walked in here. But that's important for me, is the - - you know, be able to move around with the conditions that I have. I mean, I move around. I do like this all day. I'm adjusting . . . ." (Tr. at 58-59.)

Plaintiff indicated that, as to standing, he has "a harder time with that, the low back tends to affect my shoulders when I try to stand . . . ." (Tr. at 59.) As to walking, Plaintiff stated, "I walk okay. I walk okay." (Tr. at 60.) Plaintiff indicated that he cannot reach with his left side but that he could lift a gallon of milk and cares for his own personal care. (Tr. at 60-61.) Plaintiff also stated that he would need help moving anything "that weights more than an end table" and he estimated an end table would weigh "30 pounds maybe, 20, 30 pounds. But, I mean, that can cause problems for me it's just, generally, I guess it wouldn't." (Tr. at 61.) Plaintiff indicated that he could drive for "a couple hours" before having to stop. (Tr. at 70-71.) Plaintiff stated that he "got along with the [prison] inmates pretty well" at work but "had tremendous problems with getting along with my coworkers." (Tr. at 61-62.) Plaintiff also stated that his relationships with friends and family are "[n]ot good at all" and that his relationships with women "always seem to end the same way" in that he has "been left each time" due to his "anger." (Tr. at 62.)

At the administrative hearing, the ALJ asked the vocational expert ("VE") to consider a person with Plaintiff's background who

> would require work, which is simple and unskilled. This individual should not work in close proximity to coworkers; meaning, the individual could not function as a member of a team, and with minimal direct contact with the public.
>
> This individual can have occasional supervision. This individual can perform work in the light exertional range, with a sit/stand option while remaining at the work station. Sit/stand option means the individual could sit or stand at will, while performing the assigned duties. This individual could stand for, approximately, an hour at a time. Has unlimited ability to walk, with normal breaks. Total of walking and standing would be six hours in an eight-hour workday.
>
> This individual could sit in one-hour increments and with normal breaks for a total of six hours in an eight-hour workday. This individual could perform bilateral

18

overhead reach on a frequent basis. This individual should avoid concentrated exposure to unprotected heights, moving machinery and vibrations. This individual can perform postural activities occasionally [INAUDIBLE] climbing ramps and stairs, balancing, stooping, crouching, kneeling, crawling. No climbing of ladders, ropes and scaffolds.

(Tr. at 75.) The VE responded that such a person could not perform Plaintiff's past work but could perform the 1,800 packager, 1,800 inspector, and 4,000 office jobs doing things such as sorting mail and putting promotional mailings together, which are in the light exertional category and which are available in the State of Michigan. (Tr. at 76.) The VE also indicated that these jobs account for the sit/stand option. (*Id.*) The VE confirmed that his testimony was consistent with the Dictionary of Occupational Titles. (*Id.*)

### F.    Analysis and Conclusions

### 1.    Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, he possessed the residual functional capacity to perform a limited range of light work. (Tr. at 17-23.)

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.    Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 9.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that the ALJ failed to properly evaluate medical source opinions, i.e., that she failed to give sufficient weight to the opinions of Dr. Uhlmann (Doc. 9 at 8-13), Dr. Laurence Domino (*id*. at 13-14), and Dr. Mukesh Lathia (*id*. at14-15), and that she gave too much weight to the opinions of Dr. Newhouse (the state agency medical consultant) (*id*. at 15-16), and Dr. Stehouwer. (*Id*. at 16-17.) In addition, Plaintiff contends that the ALJ should have given Plaintiff's GAF scores more weight. (*Id*. at 18-19.)

### a.    Treating Sources

### i.    Standards

"Medical opinions are statements from physicians and psychologists or other 'acceptable medical sources' that reflect judgments about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." SSR 06-3p, 2006 WL 2329939, at *2 (2006).

The opinion of a treating physician should be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2). "The more a medical source

presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 404.1527(c)(3). "Moreover, when the physician is a specialist with respect to the medical condition at issue, . . . her opinion is given more weight than that of a non-specialist." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

Since the Commissioner is responsible for determining whether a claimant meets the statutory definition of disability, the ALJ "will not give any special significance to the source of an opinion[, including treating sources], on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section[,]" i.e., whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, residual functional capacity, and application of vocational factors. 20 C.F.R. § 404.1527(d)(3). A "[d]octor's notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' [Thus,] [a]n ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011). "Otherwise, the hearing would be a useless exercise." *Id.*

"[O]nce well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight . . . [but] 'is just one more piece of evidence for the administrative law judge to weigh . . . .'" *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (quoting *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)). Once the treating source is placed on the same level as other medical opinions, the treating source opinion should not be subjected to "greater scrutiny" than the non-treating sources, especially when there are more

flagrant inconsistencies in the opinions of the non-treating sources. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 379-80 (6th Cir. 2013).

If the ALJ declines to give controlling weight to a treating source's opinion, then he must use the following factors to determine what weight the treating source opinion should be given: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. These factors may be applied to all medical opinions, not just treating sources. SSR 06-3p, 2006 WL 2329939, at *3 (2006). However, because of the special status of treating source opinions, where the ALJ "failed to conduct the balancing of factors to determine what weight should be accorded these treating source opinions . . . , [t]his alone constitutes error." *Cole v. Comm'r of Soc. Sec.,* 652 F.3d 653, 660 (6th Cir. 2011) (quoting *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009)). But this error is not always dispositive and can be considered "harmless error" if: "(1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of § 1527(d)(2) . . . even though she has not complied with the terms of the regulation." *Cole*, 661 F.3d at 940 (quoting *Wilson*, 378 F.3d at 547).

A physician qualifies as a treating source if the claimant sees the physician "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." 20 C.F.R. § 404.1502. "Acceptable medical sources" who can be considered treating sources include "licensed or certified psychologists." SSR 06-03p, 2006 WL 2329939, at *1-2 (2006). After treating sources, a "nontreating source, who physically

22

examines the patient 'but does not have, or did not have an ongoing treatment relationship with' the patient, falls next along the continuum." *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 439 (6th Cir. 2012) (quoting *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007)). "'The opinion of a non-examining physician, on the other hand, 'is entitled to little weight if it is contrary to the opinion of the claimant's treating physician.'" *Adams v. Massanari*, 55 F. App'x 279, 284 (6th Cir. 2003) (quoting *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987)).

"Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 2011 WL 2745792, at *4. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

### ii.    Analysis

Plaintiff contends that the ALJ failed to give sufficient weight to the opinions of Dr. Uhlmann, Dr. Laurence Domino, and Dr. Mukesh Lathia, and that she gave too much weight to the opinions of Dr. Newhouse and Dr. Stehouwer. (Doc. 9 at 8-17.)

As an initial matter, I suggest that Dr. Uhlmann's conclusion that Plaintiff is not able to work (Tr. at 451, 490) is an opinion on the ultimate issue of whether a claimant is disabled, which is reserved to the Commissioner and therefore is not entitled to any weight. 20 C.F.R. § 404.1527(d)(3). In addition, I suggest that the ALJ properly analyzed and stated the reasons for her conclusions as to all the medical opinions pursuant to the requirements of SSR 96-2p, and that her reasoning and conclusions are supported by substantial evidence. (Tr. at 20-22.)

With regard to Dr. Uhlmann's opinions, the record reveals that they are inconsistent and the inconsistency is not explained by any changes in Plaintiff's condition. For example, in April 2010, Dr. Uhlmann concluded that Plaintiff could return to work without any restrictions as of June 2010, as long as the work was not his former occupation as a corrections worker. (Tr. at 441.) Without an explanation of any changes in Plaintiff's condition, in June 2011, Dr. Uhlmann found Plaintiff was moderately to markedly limited in all areas and concluded Plaintiff was unable to work. (Tr. at 446-47.)

The next month, Dr. Uhlmann concluded that Plaintiff could perform simple work tasks and was limited, but not precluded, from attending work regularly, performing detailed work, being punctual, and performing at a consistent pace. (Tr. at 450-51.) However, Dr. Uhlmann also opined that Plaintiff's impairments would cause him to miss work more than four days per month, which is inconsistent with his finding that Plaintiff was not precluded from attending work regularly. (*Id.*)

In September 2011, Dr. Uhlmann found that Plaintiff could only perform repetitive or short cycle work and that he was moderately or markedly limited in all other areas. I suggest that Dr. Uhlmann's conclusions are inconsistent with one another. In addition,  as the ALJ concluded, Dr. Uhlmann's conclusions are inconsistent with statements in Plaintiff's medical records. I therefore suggest that the ALJ properly discounted Dr. Uhlmann's opinion.

24

As to Dr. Domino's opinion, the ALJ noted that the standards for medical retirement in Michigan are not the same as those for disability under the Social Security Administration and that his opinion was inconsistent with the evidence of record. (Tr. at 21.)[3] Since Dr. Domino was not a treating physician or an examining physician, I suggest that the ALJ's explanation, although not lengthy, was sufficient under the regulations. *See Blakely, supra.*

As to Dr. Lathia, an examining physician, I suggest that his opinion is not inconsistent with the ALJ's findings. Dr. Lathia concluded that Plaintiff was unable to do his past work as a corrections officer but did not comment on his ability to do other work. (Tr. at 412.)

I further suggest that the ALJ's findings as to mental impairments are supported by Dr. Wolf's findings that Plaintiff's "intellectual ability appeared to be in the high-average range[,] [t]here was no evidence of cognitive impairment of an organic type[,] [h]e is clearly depressed, but there is no psychomotor slowing[,] . . . [t]here is no constriction, blunting or flattening of affect[,] no clear evidence of a thought disorder of a psychotic type[,] [and] no history or evidence of hallucinations[.]" (Tr. at 430.) Dr. Wolf also concluded that Plaintiff "might be capable of employment in the future if he had access to proper psychiatric treatment. . . . The nature of the therapy with Dr. Uhlman[n] is difficult to discern." (Tr. at 431.)

I also suggest that the ALJ's findings are supported by substantial evidence as to physical impairments. MRIs showed only mild degenerative changes (Tr. at 282, 284-85, 371-72, 377, 378) and EMGs were normal or were "consistent with left Peroneal motor axonal neuropathy" but showed "no electrodiagnostic evidence for a Lumbar Radiculopathy." (Tr. at 279, 282.) Dr. Davis

---

[3]I note that this is not a case where it is alleged that the ALJ failed to consider a submitted state decision to grant benefits. Cf., *Saunders v. Comm'r of Soc. Sec.*, No. 1:08-cv-1136, 2010 WL 1132286, at *7-9 (W.D. Mich. Mar. 3, 2010) (the court noted that 20 C.F.R §§ 404.1504 and 416.904 provide that although decisions from other agencies are not binding, the other decisions must be considered. but since the agency's decision presented "bare conclusions[,]" any error would be harmless).

concluded that he really did "not feel that clinically [Plaintiff] is suffering from radicular pain, myelopathy, or any nerve compressive syndrome." (Tr. at 375.) In addition, I note that the ALJ incorporated the physical limitations outlined by Dr. Bleiberg. (Tr. at 398.) Moreover, Dr. Lazzara found that Plaintiff "did have a significant myofascial component" but there "were no myelopathy or neuropathy noted . . . [and] he is scheduled to undergo physical therapy. He may require operative intervention at some point but it does not appear impending." (Tr. at 405.) As to diabetes, Dr. Lazzara noted that Plaintiff "does not check his sugars. I do not find any evidence of sequela today. However he does complain of neuropathy. At this point, sugar control would be optimal." (*Id.*) Plaintiff's strength was 5/5. (Tr. at 408.)

I also note that Plaintiff was treated with prescription medications and a few steroid injections and that he was never hospitalized for mental or physical impairments. Such modest treatment is inconsistent with a finding of disability. *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 (6th Cir. 2011); *Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 334-35 (6th Cir. 2007).

Finally, I suggest that the ALJ's overall findings are supported by Plaintiff's own testimony that his back pain is better described as being "uncomfortable" and that he has had "quite a bit of success" with steroid injections. (Tr. at 55-57.) In addition, the ALJ incorporated a sit/stand option which comports with Plaintiff's testimony that he "could sit here for a long time" but would be very stiff if he were not able to move around and adjust. (Tr. at 58-59.) Moreover, Plaintiff stated that he "walk[s] okay" and that he would only need help moving something "that weighs more than an end table," which he estimated to be 20 or 30 pounds. (Tr. at 60-61.) The ALJ's findings are also supported by Plaintiff's report to his doctor of his daily activities. He stated that "after breakfast he may visit his mother[,] . . . may shop for groceries or run other errands[,] . . . watches

television including sports[,] [and] may drink half a pint of vodka once or twice a week[.]" (Tr. at 427.)

**b.    GAF Scores**

Finally, Plaintiff contends that the ALJ should have given Plaintiff's GAF scores more weight. (Doc. 9 at 18-19.) The Commissioner "has declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007) (citations omitted). Therefore, any decision not to rely on the GAF score is of little consequence and would not undermine a decision supported by substantial evidence. *See also Oliver v. Comm'r of Soc. Sec.*, No. 09-2543, 2011 WL 924688, at *4 (6th Cir. Mar. 17, 2011) (upholding ALJ's decision not to rely on GAF score of 48 because it was inconsistent with other substantial evidence in the record and noting that the "GAF score is not particularly helpful by itself"); *Turcus v. Soc. Sec. Admin.*, 110 F. App'x 630, 632 (6th Cir. 2004) (upholding ALJ's reliance on doctor's opinion that plaintiff could perform simple and routine work despite GAF score of 35).

**3.    Conclusion**

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III.   **REVIEW**

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

                                                     s/ 𝔠𝔥𝔞𝔯𝔩𝔢𝔰 𝔈 𝔅𝔦𝔫𝔡𝔢𝔯
                                                     CHARLES E. BINDER
Dated: December 17, 2013                             United States Magistrate Judge


### **CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  December 17, 2013                    By     s/Patricia T. Morris
                                            Law Clerk to Magistrate Judge Binder